Staples, J.
The questions presented by the demurrer to the declaration may be more satisfactorily disposed of in passing Upon the instructions and the motion for a new trial. Two of the instructions were given on the motion of the defendant, and of course there is no complaint with respect to them. The third was given by the court in answer to a question propounded by the jury. In order properly to understand the heaping of this instruction, it will be necessary to recur briefly to the facts upon which it was based. It seems that one of the charges preferred by the defendant, as mayor, against the plaintiff. as chief of police, and upon which the removal of the latter was partly founded, was, that the plaintiff “ had continued to act as agent for Dr. W. O. Owen, contrary to the express written and verbal order of the defendant, as mayor.” When this charge was under investigation before the defendant, the plaintiff was examined on oath by the defendant, and admitted that he “was agent of Dr. Owen, to collect his medical accounts and keep his. books;” hut he also proved that he had not neglected any of his duties as chief of police by reason of his being such *27 ascent, and that he had not been occupied more than five minutes of his time any day in a year in attending to Dr. Owen’s business;- nor was there any evidence that he had ever neglected any of his duties as chief of police in consequence of such employment. The plaintiff also proved that he had been told by James W. Cobbs, the former mayor, John W. Carroll, president of the council, and Janees Garland, judge of the hustings court, members of the former police board, that he might act as such agent for Dr. Owen when it did not interfere with his official duties as chief of police, and that he had a like permission from two of the present hoard of police commissioners. It further appeared that while under Examination before the mayor the plaintiff said that he had acted, and would continue to act, as agent of Dr. Owen, notwithstanding the order of the mayor. These matters, as they occurred before the mayor, were proved during the progress of the trial in the court below. The jury having retired to consult of their verdict, came into court and enquired of the court whether or no the mayor had a right to prevent the plaintiff from acting as agent of Dr. Owen. To this, the following answer was made by the judge in writing: “If the chief of police had a license by an order or permission from the board of police commissioners to act as collector or agent of Dr. Owen, or if by so acting his official duties as such chief of police were or could in nowise be interfered with, and his efficiency as a public officer in nowise impaired thereby, then the mayor had no right to inhibit him from so acting as collector or agent. But on the other hand, if he had no such license or permission from the police board, and his so acting did in any wise interfere with his duties as chief of police, or render him in any way less efficient as a public officer, then the mayor had a right to inhibit him from so acting, if he in good faith *28 believed that the public interest would be promoted by so prohibiting him.”
The main objection to this instruction is based upon the idea that the mayor is the chief executive officer of the city of Lynchburg, and as such has the supervision and control of the chief of police; that the propriety of his orders to that officer, or to any other subordinate, cannot be called in question in any other tribunal; that this rule is essential to the enforcement of discipline and the preservation of order; that the judge of the circuit court ought so to have told the jury, and that his answer in the form in which it was given was calculated to lead the jury to the erroneous conclusion that they had the right to pass upon the propriety of the order in question.
Without undertaking now to concede or to controvert the soundness of this proposition, I think it is sufficient to say that the learned judge of the circuit court, on the motion of the defendant’s counsel, and in the very language selected by him, had already fully stated the law applicable to this branch of the case. He had declared that the gist of the action is want of probable cause; and although the jury should believe the defendant was hostile to the plaintiff', and was actuated by malice, still, unless each one of the charges of the defendant was unsupported by any evidence tending to prove it, or the charge was in itself so frivolous that the defendant did not and could not reasonably regard it as a real offence, they must find for the defendant; provided the matter so charged related to the official duty of the plaintiff', and was a misconduct in office or a neglect of official duty, or such as the defendant might reasonably believe, and did honestly believe, w-as such misconduct or neglect of official duty.
And the judge further told the jury, that if they believed from the evidence that any one of the specifications on which the defendant found the plaintiff' guilty *29 was a misconduct in office or neglect of official duty, proved to the reasonable satisfaction of the defendant, and being so proved, was, in his opinion, just cause for the removal of the'plaintiff from office, they must find for the defendant.
How, if these instructions, instead of preceding, had followed the answer given by the judge to the enquiry made by the jury, it is impossible there could have been any ground for misapprehension. The court gave the defendant all he asked. It laid down the law in his favor in the most liberal manner; and we must suppose the jury had the intelligence to comprehend and to remember what was said in the first as in the last instruction. Taking them all together, how are they to be construed? Plainly, as declaring that, although the jury might believe the plaintiff was not guilty of any neglect of duty in collecting Dr. Owen’s accounts, and although the defendant had no right to prohibit him from so acting, and although the defendant may have removed the plaintiff for a violation of his orders in that particular, the defendant could not be held liable if the conduct of the plaintiff was such as the defendant might reasonably believe, and did honestly believe, was a neglect of duty. In other words, however erroneous may have been the orders of the defendant, and however malicious his motives, he is exempt from all liability if the alleged mis•conduct or neglect of official duty was proved to his reasonable satisfaction,' and being so proved, was, in his opinion, just cause for the removal of the plaintiff from office.
It is rarely that a case occurs in which the law is so fully and favorably expounded for one of the parties upon a question of this character.
Under such instructions it might well be supposed that the jury would have found a verdict for the defendant, and it is very probable they would have so found, but *30 that the plaintiff produced evidence tending to show that before any of the charges were preferred against him the defendant had determined to remove him from office, under color of his authority as mayor, in consequence of personal enmity and dislike, whether there was any cause for removal or not; and he also offered to show that the said charges were false and malicious, but was stopped by the court upon objections made by the defendant. Under all these circumstances, it is plain that the defendant did not and could not sustain any injury by the instruction given in answer to the question propounded by the jury. It is equally apparent, for the same reasons, that the court did not err in overruling the motion for a new trial.
But there is another and more satisfactory reason which applies equally to the demurrer, to the instruction, and to the motion for a new trial; and that is, that the defendant, as mayor, had no power under the constitution and laws to remove the plaintiff from his office of chief of police. This question has been very ably argued by counsel, and has received the careful consideration of the court. The provision of the constitution under which this power is claimed as belonging to the mayor is found in section 20, article d, of that instrument. (Code of 1873, page 88.) It provides that the mayor shall see that the duties of the various city officers are faithfully performed. He shall have power to investigate their acts, have access to all books and documents in their offices, and may examine them and their subordinates on oath. He shall have power to suspend or remove such officers, whether they be elected or appointed, for misconduct in office or neglect of duty, to be specified in the order of suspension or removal.
On the other hand, the amended charter of the city of Lynchburg (found in Acts of 1871-72, page 118), provides for a police department, to be under the control *31 and management of police commissioners, consisting of the mayor, the president of the city council, and the judge of the corporation court.
It is made their duty to appoint the chief of police, through whom they may promulgate all rules and regulations and orders to the whole police force of the city. The said chief of police holds his office during the term of two years, or until said board, for malfeasance or misfeasance, shall remove him; but in case of misconduct on his part, he may be removed by the votes of two-thirds of the city council. The mayor, at any time upon charges being preferred, or upon finding said chief of police to have been guilty of misconduct, shall have power to suspend him from office until the board of commissioners shall convene and take action in the matter; such suspension, however, not to last longer than ten dayp without affording the party an opportunity of being heard in his defence; and upon hearing the proofs a majority of the commissioners may discharge or restore him. See sec. 36, paragraphs 1, 2, 3 and 4, pages 128-9.
It will be perceived there is an apparent conflict between these provisions of the Lynchburg charter and the clause of the constitution already cited. For if the chief of police be a city officer within the meaning of the constitution, he is subject to removal by the mayor only, and the provision of the charter taking the power from him and vesting it in the police board is null and void.
This court has been repeatedly called on to pronounce legislative enactments void upon the ground of their repugnancy to the constitution, and it has always declined to do'so unless this repugnancy is, in its judgment, beyond all reasonable doubt. It has always proceeded upon the idea that the opposition between the constitution and the law is such that the judge feels a clear and strong conviction of their incompatibility with each other. "Whenever a statute can be so construed and applied as *32 .to avoid conflict with the constitution such construction will be adopted. In the language of Mr. Justice Wash-“It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity until its violation of the constitution is proved beyond all reasonable doubt.” Ogden v. Saunders, 12 Wheat. R. 213, 270; Cooley’s Const. Limitations, page 182, 183.
In the present case this rule of construction deserves special consideration, because the same provisions in regard to the appointment, control and removal of the chief of police are found in the charters of the cities of Richmond and Eorf'olk, and perhaps other cities, and the effect of an adverse decision by this court will be to annul important and salutary laws carefully framed for the government and security of the chief cities and towns of the commonwealth. Are we to declare these charters null and void? Are we to overthrow institutions deemed by the legislature and the people of the cities of the greatest value? I think not, unless upon very convincing reasons.
It must be borne in mind that cities and towns are mere territorial divisions of the state, endowed with corporate powers to aid in the administration of public affairs. They are instrumentalities of the government acting under delegated powers, subject to the control of the legislature, except so far as may be otherwise expressly provided by the constitution.
Although the mayor is invested with the power of removing city officers, it will not be denied, I imagine, that the legislature may establish an office and appoint the incumbent, who, although exercising his jurisdiction exclusively in the city limits, is not yet a city officer within the true intent and meaning of the constitution. This distinction is recognized in the clause of the consti *33 tulion already cited relating to the powers of the mayor. It is there declared that all city, town and village officers, whoso election or appointment is not provided lor by this constitution, shall be elected by the electors of said cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the general assembly shall designate. “All oilier officers, whose election or appointment is not provided for by this constitution, and all other officers whose offices may hereafter be created by law, shall be elected by the people, or appointed as the general assembly may direct.” Thus recognizing a distinction between those who are technically “city officers” and others whose jurisdiction and functions may be limited to cities, and yet are not considered “ city officers.” In the former case the appointment is always made by the electors of the city, or some authority of the city. In the latter case it is made in such mode as the general assembly may direct. Indeed it would be a most remarkable condition of things that the legislature, by the mere act of creating a municipal corporation, thereby divests itself of all jurisdiction and control of every officer elected or appointed for such corporation.
Who, then, are the “ city officers,” in the true and literal sense of the term ? It is not easy to define them in all cases; but there ■ are many such provided for in the charter of the city of Lynchburg, and in the charters of other cities. Among those are, perhaps, city engineers and surveyors, officers having superintendence and control of streets, parks, water-works, gas-works, hospitals, sewers, cemeteries, city inspectors, and no doubt many others well known in large cities. Their duties and functions relate exclusively to the local affairs of the city, and the city alone is interested in their conduct and administration.
On the other hand, there are many officers, such as *34 city7 judge, sergeant, clerk, commonwealth’s attornej’, treasurer, sheriff, high constable, and the like, some of whom are recognized by the constitution, while others are not. All these are generally mentioned as city officers, and they are even so designated in the constitution ; hut no one has ever contended that either of them is in any manner subject to the control and removal of the mayor. The reason is, that while they are elected or appointed for the city, and while their jurisdiction is confined to the local limits, their duties and functions, in a measure, concern the whole state. They are state agencies or instrumentalities operating to some extent through the medium of city charters in the preservation of the public peace and good government. However elected or appointed, however paid, they are as much state officers as constables, justices of the peace and commonwealth’s attorneys, whose jurisdiction is confined to particular counties.
That the chief of police is within the influence of the same principle is apparent from the most cursory reflection. Under the charter of the city of Lynchburg—and the same is'true elsewhere—he has generally the power to do whatever may he necessary to preserve the good order and peace of the city. It is his duty at all times to see that the police force preserves the public peace, to prevent the commission of crime, and arrest offenders, and protect the rights of persons and property. (Sec. 36, §§ 1, 2, 3, 4, page 128, Acts of 1871 and 2; Police Regulations, § 14.) Among the thousands of citizens and strangers that enter a great city in the course of a year, in pursuit of business or pleasure, there is not one that is not interested to a greater or less degree in this officer, not only as a conservator of the peace generally, but in the special protection he affords against violence and wrong. When the mob rages in the streets, when the incendiary and the assassin are at work, they do not *35 offend against the city, but against the state. When they are detected and arrested it is by the chief of police and his subordinates, under the authority of the state laws aud as an office^ of the state; and when they are tried and convicted, it is by officers representing the state and her sovereign power.
This distinction has been recognized and enforced in a number of well considered cases, and by able commentators. It is important, says Judge Dillon, to hear in mind the distinction between state officers—that is, officers whose duties concern the state at large or the general public, although exercised within defined territorial limits, •and municipal officers whose functions relate exclusively to the particular municipality. The administration of justice, the preservation of the public peace, and the like, although confided to local agencies, are essentially matters of public concern, while the enforcement of municipal by-laws, the establishment of gas-works, of water-works, the construction of sewers, and the like, are matters which pertain to the municipality, as distinguished from the state at large. And it has been several times determined that the legislature may, unless specially restrained in the constitution, take from a municipal corporation its charter powers respecting the police and their appointment, and by statute itself directly provide for permanent police for the corporation, under the control of a board of police not appointed or elected by the corporate authorities, hut consisting of commissioners appointed by the legislature.. Baltimore City v. Board of Police, 15 Maryland R. 376; People v. Mahaney, 13 Mich. R. 481; People v. Draper, 15 New York R. 532, where the act to establish the Metropolitan police district was held constitutional; Police Commissioner v. City of Louisville, 3 Bush. Kentucky R. 597; Diamond v. Cain, 21 La. Ann. R. 309; State of Louisiana v. Levi, Id. 538. The cases concur in holding that the police officers are *36 in fact state offices’s, and not municipal, although a particular city or town be taxed to pay them. 1 Dillon on Municipal Corporations, §§ 33, 34; § 773 and note 1, where the foregoing view's are expressed.
In Buttrick v. City of Lowell, 1 Allen’s R. 172, it wras held that a city is not liable for an assault committed by its police officers, even though it was done in an attempt to enforce an ordinance of the city. Bigelow, Chief Justice. delivering the opinion of the whole court, said: “Police officers can in no sense be l'egarded as agents or officers of the city. Their duties are of a public nature, their appointment is devolved on cities and towns by the legislature as a convenient mode of exercising a function of government, but this does not render them liable for their unlawful or negligent acts. The detection' and arrest of offenders, the preservation .of the public peace, the enforcement of the laws, and other similar powers and duties with which police officers and constables are entrusted, are derived from the lawr, and not from the city or town under which they hold their appointment.”
In the case of the People v. Hurlbut, 24 Mich. R. 44, the question was as to the constitutionality of a statute creating a board of public works for the city of Detroit, appointed by the legislature, and having cha3’ge of the city buildings, with authority to make contracts on behalf of the city, and to do many other things of a legislative character which generally belong to the common councils of cities alone. The whole subject was discussed by Chief Justice Campbell and Judge Cooly, in opinions evincing profound research and ability. Chief Justice Campbell drew a distinction between the police 'act under which a board of police commissioners was appointed for the cities, and the act then under consideration, wdiich was known as the public works acts. He said: “ The general purposes of the police act were such *37 as appertain directly to the suppression of crime and the administration of justice. There is therefore no constitutional reason for holding it to be other than a regulation of matters pertaining to the general policy of the state and subject to state management. The police board is clearly an agency of the state government, and not of the municipality, whereas the purposes of the public works act ívere directly1' and evidently local and municipal.” 81-83.
Judge Cooley said in the course of his opinion: “Tor those classes of officers whose duties are general, such as the judges, the officers of militia, the superintendent of police, of quarantine, and of ports, by whatever name called, provision has, to a greater or less extent, been made by state appointment. But these are more properly state than local officers; they perform duties for the state íd localities, as collectors for the general government, and a local authority for their appointment does not make them local officers when the nature of their duties is essentially general. In the case before us the offices in question involve the custody, care, management ¡.nd control of the pavements, sewers, water-works, and public buildings of the city, and the duties ai;e purely local.”
In Cobb v. City of Portland, 55 Maine R. 381, the same question was presented, and was decided in the same way. Dickerson, J., delivering the unanimous opinion of the court, said : “ But the plaintiff was not agent or servant of the city of Portland, nor w7as the policeman whom he arrested. Both were acting under the authority ■of the state, as the conservators of the public peace, the peace of the state, not the peace of the city of Portland alone. It is true they derived their authority immediately from the city of Portland, but that was done by the legislature as a matter of convenience.”
*38 While engaged in the service stated (preserving the peace), they represented the authority and dignity of the state, and not that of the city of Portland.
The cases of Fisher v. Boston, 104 Mass. R. 87; Cobb v. City of Portland, 55 Maine R. 381; The, People v. Draper, 25 Barb. R. 341, 374; Mayor of Baltimore v. State Board of Police, 15 Maryl. It. 376, are in entire accord with the decisions already cited. See also 2 Dillon, sec. 773, and notes, and numerous cases there cited. The distinction recognized in all of them is between officers whose duties are exclusively of a local nature and' officers appointed for a particular locality, but yet whose duties are of a public or generaL nature. When they are' of the latter character they are state officers, whether the legislature itself makes the appointment or delegates its authority to the municipality. The state, as a political society, is interested in the suppression of crime and in the preservation of peace and good order, and in protecting the rights of persons and property. Ro duty is more general and all-pervading than this. It extends alike to towns and cities as .to the country. It looks to the preservation of order and security in the state, at elections, and at all public places; the protection of citizens, strangers, travellers at railway stations, at steamboat landings; the enforcement of the laws against intemperance, gambling, lotteries, violations, of the Sabbath, and, in fine, the suppression of all those disorders which affect the peace and dignity of the state and the security of the citizen. The instrumentalities by which these objects are effected, however appointed, by whatever name called, are agencies of the state, and not of the municipalities for which they are appointed or elected. The whole machinery of civil and criminal justice, says a learned judge, has been so generally confided to local agencies, it is not strange if it has sometimes been *39 considered as of local concern. But there is a clear distinction in principle between what concerns the state and that which does not concern more than one locality.
These are the principles established b}’ the cases already cited. Against them not a decision, not even the dictum of a writer has been produced, except a single observation contained in the opinion of this court, in Burch, Mayor, v. Hardwicke (the same parties now before the court, reported in 23 Gratt. 51), where Judge Bouldin seems to concede that the power of removing the chief of police is vested in the mayor. It is, however, but just to say that the question received but little consideration by this court' in that case; nor was there anything in the case itself requiring a decision of the point. The real contention was, whether the writ of prohibition would lie in the case. Judge Bouldin laid down the rule as well established, that the writ of prohibition is a proceeding between courts bearing the relation of supreme and inferior, and that it does not lie from a court to an executive officer. The case ivas disposed of upon that ground alone, and all that was said outside of it was an obiter dictum of the court. That decision, therefore, does not preclude us from determining the present case according to our best convictions. If the view already taken be correct, it is plain that the defendant, in removing the plaintiff from his office of chief of police, exceeded his powers. This being so, it is quite immaterial to enquire whether the instruction of the circuit judge be strictly correct. Plainly the defendant could not be prejudiced by it; for if it be conceded that the plaintiff was not justified in disobeying the order given him, the defendant exceeded his powers in removing him on that ground. All that the defendant could do was to suspend the plaintiff until the matter could be investigated by the board of police commissioners.
It is no part of our duty to enquire into the motives of *40 the legislature in creating a board of police for the cit}7 of Lynchburg, or any other city, and in clothing it With the absolute control of the chief of police. The legislature may have supposed that the mayor being elected by toe popular vote, might be under strong temptation to use the police force tor the purpose of securing his own promotion and success. It is not to be denied that in a large and populous city such a body of men, dependent upon the will of one man, may become a political engine of mischief in times of high political and party excitement.
On the other hand, a board of police composted of the mayor, the president of the common council, and the judge of the hustings court, would be equally as efficient as the mayor in the control of the police department, especially when the latter is invested with the power of suspension for a disobedience of order's or other misconduct. Three of the largest cities of the state have been acting under the same system for several years, and no complaint has been made of the want of discipline, insubordination and good government in either of them. In such case nothing would justify the interference of the courts except the clearest conviction that the constitution had been violated.
Another question argued before this court is, whether the mayor of a city, in exercising the power of removal of a subordinate, can in any case be held liable for damages, however malicious or corrupt may have been his motives. Upon this question a great number of authorities have been cited on both sides. Some of these maintain the doctrine that no public officer is responsible in a civil suit for a judicial determination, however erroneous it may be, or however malicious the motive which produced it; and this rule extends to judges, from the highest to the lowest, and all public officers, whatever name they may bear, in the exercise of judicial powers. *41 On tlie other hand, there are numerous authorities which hold that this exemption from civil liability is confined exclusively to those judges of general jurisdiction whose proceedings are matters of record, and has no application to inferior judges and others whose acts are not verified by record evidence.
Whatever may he the conflict of judicial opinion on this point, all the authorities are agreed that when the judge or other officer has no jurisdiction over the subject matter, and when the act of which complaint is made is maliciously or corruptly done, he is liable in damages to the party aggrieved by his conduct. This whole question is discussed in a very able opinion of Mr. Justice Field, in Bradley v. Fisher, 13 Wall. U. S. R. 335. I do not deem it necessary to refer to any other authority upon this point.
In the present case it is clear that the defendant exceeded his jurisdiction in removing the plaintiff; and it must he assumed that he was prompted by malice in doing so, for the plaintiff offered to prove the fact, but was prevented by the objection of the defendant; and the defendant cannot now7 he heard to deny the existence of malice on his part. There is no doubt but that the defendant believed that the power of removal was vested in him by the constitution, and for an innocent mistake iu assuming that power, under all the circumstances, no jury or court would he inclined to hold him responsible in damages. It is only when the power is used for the gratification of personal hostility and dislike, that the question assumes an entirely different aspect, and in that aspect alone it is now presented to this court.
It has been suggested, however, that the action is based upon an actual removal of the plaintiff' from his office by the d fendant; and according to the present view7, the proceeding of the defendant wras a mere nullity, and the *42 plaintiff was still the incumbent of the office. It is suffi cient to say that the plaintiff', as a matter of fact, was removed from his office and denied the privilege of exercising its functions by the defendant; and however illegally it may have been done, it was a power exercised under co lor of the office of mayor, and it does not lie in the mouth of the defendant to evade liability for his acts upon the ground that he exceeded his powers and jurisdiction.
The plaintiff attempted to restrain the defendant from removing him from his office by judicial process; but was denied relief upon the ground that the courts had no power to award a writ of prohibition against an officer exercising merely executive functions. After this the plaintiff', instead of continuing an angry and unseemly contest with the defendant, perhaps to the injury of the city of Lynchburg, might well acquiesce in his ejection from the office, and resort to the courts for redress of any wrong he had sustained. The defendant has certainly no cause to complain that this course has been pursued.
As all the testimony is not before us, it is impossible to say that the damages are excessive. This may be said, however, that the case was tried by an intelligent and impartial jury, before an able and impartial judge, all of whose rulings were of the most favorable character for the defendant. It is scarcely necessary to add that the circuit court did not err in overuling the motion for the new trial, either upon the merits of the case generally, or upon the special grounds upon which the motion was based in the lower court. My opinion, therefore, is to affirm the judgment.
Moncure, P., and Anderson and Lurks, J’s, concurred in the opinion of Staples, J.
Christian, J., dissented.
Judgment affirmed.